# EXHIBIT 2

Kane Warehousing Amendment #19 to Contract and Rate Quotation

This Amendment ("Amendment 19") is effective this 28th day of May 2024 (the "Effective Date") between Kane Warehousing, LLC, an ID Logistics Group company (f.k.a. Kane Warehousing, Inc.) ("SELLER" or "Warehouseman") and Hub Group, Inc., a Delaware corporation as successor in interest to CaseStack, Inc. ("BUYER" or "Depositor"). Both SELLER and BUYER may be referred to collectively as the "Parties" or individually as a "Party."

WHEREAS, BUYER and SELLER entered into that certain agreement for warehouse services dated July 26, 2006 ("Initial Agreement");

WHEREAS, BUYER and SELLER previously entered into an Amendment #1 dated September 1, 2008; an Amendment #2 dated March 1, 2010; an Amendment #3 dated March 1, 2010; and Amendment #4 dated December 1, 2012; an Amendment #5 dated June 1, 2014; an Amendment #6 dated June 1, 2015; an Amendment #7 dated April 1, 2016; an Amendment #8 dated July 1, 2016; an Amendment #9 dated August 1, 2018; an Amendment #10 dated January 1, 2019; an Amendment #11 dated January 31, 2020; an Amendment #12 dated October 1, 2020; an Amendment #13 dated October 12, 2021; an Amendment #14 dated February 8, 2021; Amendment #15 dated March 1, 2021; an Amendment #16 dated July 5, 2021; Amendment #17 dated October 1, 2022; and Amendment #18 dated May 1, 2024 (the Initial Agreement and the amendments thereto shall hereinafter be collectively referred to as "**Agreement**") and now wish to further amend the Agreement as set forth below.

1. **DC6 Facility**

    a. **Depositor as Tenant**. The existing DC6 Facility lease held by Warehouseman will expire on July 31, 2024. At expiration, Warehouseman will not extend the DC6 Lease term. Instead, effective August 1, 2024, Depositor represents that it will take the lease with the Landlord thereby becoming the Tenant of the DC6 Facility. As a result, any reference in the Agreement related to Warehouseman assuming the risk for the DC6 Facility will be null and void as of such date. As the new tenant, Depositor shall assume the responsibility and risks associated with the DC6 Facility.

    b. **Term.** The term of the Agreement shall be extended for the DC 6 Facility for a period of five (5) months expiring December 31, 2024 ("**Amendment 19 Term**"). There will be no automatic extensions beyond the Amendment 19 Term. In the event the Parties mutually desire to extend the term beyond the expiration date set forth in this paragraph, the Parties must set forth all of the terms and conditions in a separate writing signed by authorized representatives of each Party.

    c. **Logistics Services**. Except as specifically set forth herein, Warehouseman shall be the sole and exclusive logistics provider ("**LP**") within the DC6 Facility at all times during the Amendment 19 Term. For avoidance of doubt, LP services may include, but are not limited to, supply chain, warehouse management, storage, operations, inventory, shipping, picking, receiving, cross-dock, lumper, yard jockey, maintenance, etc. If Depositor desires to outsource any LP services during the

      Amendment 19 Term (as opposed to Depositor performing LP services itself), Depositor must first obtain written approval from Warehouseman.

   d. **Discussion Prior to Expiration**. Warehouseman and Depositor agree to meet no less than ninety (90) days prior to the expiration of the Amendment 19 Term to meet and align on either: (i) the potential for continuation of services beyond the Amendment 19 Term; or (ii) need to begin wind down services, including, but not limited to, communicating any retention payments to employees, issuing any required legal notices (i.e. WARN), and preparing to leave the facility in a broom swept condition. Any such mutual decision to continue must be agreed upon in writing by both parties.

   e. **New Schedule B**. Effective July 1, 2024, Schedule B of the Agreement, with regard to the DC6 Facility only, is hereby deleted and replaced with the modified Schedule B, attached hereto and incorporated herein by reference.

   f. **Schedule B-1**. As of July 1, 2024, Schedule B-1 of the Agreement is hereby deleted, void, and has no further force and effect.

   g. **Hold Over**. Depositor shall be responsible for any costs, damage, claims, liabilities, and expenses (including attorney's fees) arising from Warehouseman's requirement to be out of the DC6 Facility triggered by an early termination of the Warehouseman's short term lease extension, as identified in Amendment #18, or otherwise incurred which are caused by Depositor (collectively "**Holdover Costs**"). Any Holdover Costs related to the DC6 Facility incurred by Warehouseman will be charged to the Depositor at cost plus a 20% fee, as described in Exhibit B.

   h.  **Access; Cooperation**. Upon execution of this Amendment, Depositor shall have access to the DC6 Facility as a future tenant for purposes of preparing such facility for Depositor's eventual occupation thereof (e.g., IT cabling) and performance of LP services for G3/Prestige as further discussed below. Depositor shall indemnify and hold harmless the Warehouseman, its officers, directors, employees, and agents from and against all third party demands, causes of action, damages, claims, liabilities, expenses (including reasonable attorneys' fees), losses, and penalties suffered by any of them to the extent arising out of Depositor and its officers, directors, employees or agents' negligence or willful misconduct while accessing the DC6 Facility under this provision. Further, the parties agree to cooperate in good faith to assist each other in the transition of LP services within the DC6 Facility.

2. In the event of any inconsistency between any of the terms of this Amendment 19 and the terms of the Agreement or Amendment #1 through Amendment #18, the terms of this Amendment 19 will control.

3. Other than as expressly set forth herein, all of the terms and conditions of the Agreement and Amendment #1 through Amendment #18 shall remain as written.

4. This Amendment 19 may be executed in two or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one of both counterparts have been signed by each of the Parties and delivered to each of the Parties.

The Parties have caused this Amendment 19 to be executed by their duly authorized representatives as of the Effective Date referenced above.

| Kane Warehousing, LLC, an ID Logistics Group company | Hub Group, Inc. |
|---|---|
| By: *Matt Nolan* | By: *Brian Alexander* |
| Title: CFO | Title: COO |
| Date: 5/28/2024 | Date: 5/29/2024 |

## Schedule B

## DC 6 FACILITY PRICING

1. **Fees.** Effective as of July 1, 2024, Warehouseman will bill all costs, fees, and expenses on a monthly basis (collectively "Fees"). Depending on the type, Fees will be billed: (i) on a cost-plus basis; (ii) fixed fee; and (iii) hourly accessorial fees. Depositor shall pay all Fees within thirty (30) days of the date of the invoice.

   In the final month prior to the Amendment 19 Expiration Date, Depositor shall pay an estimated bill 30 days prior to the termination or expiration date of the Agreement. A final true-up will be sent and shall be paid by Depositor within 30 days of the termination or expiration date of this Agreement.

   a. **Cost Plus.** Depositor shall reimburse Warehouseman for all monthly Fees incurred, as set forth in the chart below, on a cost plus 20% margin basis. The cost plus shall be calculated as: cost/(1-20%).

| COST-PLUS FEES | | |
|---|---|---|
| **TYPE** | **DESCRIPTION** | **AMOUNT** |
| All Labor | Including temporary workers | Actual costs incurred at Fully loaded hourly rates |
| Security | | Actual costs incurred |
| Guard Shack Services | | Actual costs incurred |
| Handling Materials | | Actual costs incurred |
| Sanitation | | Actual costs incurred |
| Supplies | (i.e. film, labels, etc) | Actual costs incurred |
| Lot CAM | (i.e. snow plow services, etc) | Actual costs incurred |
| Pallets | | Actual costs incurred |
| Storage Rate | For entire building | Actual costs incurred |
| Holdover Expenses | For entire building | Any holdover expenses incurred by Warehouseman as set forth in Amendment 19 |

b. **Fixed Fees.** Depositor shall pay the fixed monthly Fees identified in the chart below:

| FIXED FEES | | |
|---|---|---|
| TYPE | DESCRIPTION | AMOUNT |
| IT Fees | Relating to WMS | $50,000/Month |
| IT Fees | Relating to Network | $25,000/Month |

c. **Hourly Rates.** Depositor shall pay the hourly accessorial Fees, identified in the chart below, upon request:

| HOURLY RATES | | |
|---|---|---|
| TYPE | DESCRIPTION | AMOUNT |
| IT Services | Upon request | $250/Hour |
|  |  |  |

2. **Storage Rates**. Effective as of the August 1, 2024, Depositor will hold the lease, as the tenant, for the entire DC6 Facility pursuant to a separate agreement between Depositor and the owner of the DC6 Facility. As such, Depositor will be responsible to the Landlord for any and all costs related to the DC6 Facility. Warehouseman will have no responsibility for the storage, warehouse, repairs, maintenance, or any other facility related fees.

3. **Billing**. Beginning July 1, 2024, Warehouseman will provide the following billing services to Depositor (and such further billing services as are mutually agreed by the parties):

   a. Warehouseman will send a report containing the pallet count by Depositor's customer at midnight on the first of each month;

   b. Warehouseman will send the monthly, existing report with the quantities and various activities performed which is broken down by Depositor's sub-customer; and

   c. Warehouseman will provide a monthly invoice on a cost plus basis as set forth in this Exhibit B.

The Parties agree that Depositor will invoice its own customers directly.

4. **Pallets**. All pallets in the building are currently owned by Warehouseman on behalf of Depositor (the "Pallet Bank"). The Pallet Bank value fluctuates based on usage. When put into use, the value of the pallet is charged and ownership is transferred to Depositor. For reference, the current value of the pallet bank as of March 31 is $263,650. On July 1, 2024, the Depositor will pay Warehouseman for the total value of the then existing Pallet Bank on site. After the Pallet Bank is paid in full, the Pallet Bank will cease to exist and all future pallets purchased by Warehouseman will be subject to cost plus pricing as indicated herein.

5. **Sale of Assets.** The Parties agree that Depositor will buy from Warehouseman certain assets currently within the DC6 Facility. This sale of assets will be handled in a separate bill of sale to be mutually agreed upon and executed by the Parties outside of this Agreement.

6. **Leased Equipment.** The Parties agree that Depositor will assume the lease(s) for certain leased equipment currently within the DC6 Facility. Upon execution of the assumption of lease, or similar document with the current equipment lessor, Warehouseman will no longer be responsible for the expense, cost, maintenance, or any other equipment related fees.

7. **Existing Customers**. Warehouseman currently performs LP services for several customers within the DC6 Facility. Warehouseman will either move its existing customers or terminate contracts with all customers within DC6, except for Depositor. Effective July 1, 2024, the Parties agree that Depositor will be the only Warehouseman customer in the DC 6 Facility. After this date, the Depositor will be the only customer relationship for Warehouseman; provided, however, Warehouseman may, upon request, provide LP services for G3/Prestige who will then be Depositor's customer, not Warehouseman's, and such services will be paid by Depositor to Warehouseman. Alternatively, Depositor may perform the LP services for G3/Prestige directly. For avoidance of doubt, Warehouseman and/or Depositor will perform all needed LP services within DC 6 Facility on behalf of Depositor; no other third party logistics provider will perform LP services within the DC6 Facility.

8. **Retention Fees.** The employees currently working at the DC6 Facility will remain employed by Warehouseman. However, times of transition and uncertainty, like the takeover of the lease by Depositor, may create stress and increased risk of turnover of Warehouseman's employees. Warehouseman believes it necessary to engage in discussions with Depositor to determine ways to preserve the current workforce, which may include, as mutually agreed, the need for Depositor to reimburse Warehouseman for certain retention fees or bonuses to the employees working at the DC6 Facility.

9. **Pricing Assumptions.** The following assumptions were relied upon in the creation of the pricing set forth in this Exhibit B:

    a. Depositor will continue to have Warehouseman operate LP services within the DC6 Facility using the same: (i) square footage of space; (ii) WMS system; (iii) and statement of work/work instructions; and (iv) volumes, number of

      inventory turns per year, percentage of pallet in-pallet out shipments, level of additional services needed concerning matters such as labeling and bar coding, number of SKU's per order, number of lines per order, and percentage of case pick/less-than-full pallet orders, etc as it has done in the DC6 Facility over the past twelve (12) months;

   b. Warehouseman and/or Depositor will perform all LP services for any and all customers, whether Depositor's or Warehouseman's, within the DC 6 Facility;

   c. As applicable, Depositor's customer Prestige/G3 will continue to have Warehouseman operate within the DC6 Facility using the same: (i) square footage of space; (ii) WMS system; (iii) and statement of work/work instructions; and (iv) volumes, number of inventory turns per year, percentage of pallet in-pallet out shipments, level of additional services needed concerning matters such as labeling and bar coding, number of SKU's per order, number of lines per order, and percentage of case pick/less-than-full pallet orders, etc as it has done in the DC6 Facility over the past twelve (12) months;

   d. All Warehouseman employees are subject to annual wage increases in May of each year;

   e. Warehouseman's other customer(s) may vacate approximately 125,000 sqft of space within the DC6 Facility; and

   f. Wind down services will be set forth in a separate written agreement.

10. **Material Change**. The parties acknowledge and agree that the Fees set forth in this Exhibit B are predicated upon certain information and assumptions provided by Depositor to Warehouseman as set forth in Section 9 above. In the event that any assumption(s) prove to be invalid, and/or change, or Warehouseman experiences wage increases driven by federal, state or local government mandate (e.g., minimum wage increase, expanded mandatory health insurance coverage, increase in state unemployment/wage tax), or any other factor, any of which materially affect Warehouseman's ability to perform the services required in this Agreement at the costs set forth in Exhibit B, representatives of both parties shall promptly meet and negotiate in good faith as to any necessary adjustments to the costing set forth in Exhibit B. In the unlikely event that the parties cannot achieve resolution of any pending issues associated with such costing within thirty (30) days, either party may terminate this Agreement upon thirty (30) days' written notice.

11. **Termination Obligations**. Upon termination prior to the Amendment 19 Expiration Date, for any reason, Depositor will pay to Warehouseman an early termination fee equal to the estimated revenue expected to be paid to Warehouseman in addition to: (i) the payment for any obligations incurred by Warehouseman prior to the termination date; (ii) employee retention or separation Fees incurred, plus margin; and (iii) all fixed Fees, identified in this Exhibit B, for the remainder of the term.

DocuSign Envelope ID: 38A8D436-86E8-4589-8E11-A8F36859ECD6

12. **Indemnity**. Depositor shall indemnify and hold harmless the Warehouseman, its officers, directors, employees, and agents from and against all demands, causes of action, damages, claims, liabilities, expenses (including reasonable attorneys' fees), losses, and penalties suffered by any of them arising out of any claim brought by or on behalf of any employee of Warehouseman relating to any employment law or workplace regulation, including, without limitation the Worker Adjustment and Retraining Notification Act of 1988 (the 'WARN Act')" or any similar state, federal or local law to the extent caused by Depositor's failure to provide more than sixty (60) days' notice of termination.